UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KAREEM RAMSEY,

                              Petitioner,

                                                        9:10-CV-1046

v.

                                                        (LEK/TWD)

DALE A. ARTUS,

                              Respondent.
_____

APPEARANCES:                              OF COUNSEL:

KAREEM RAMSEY
04-B-0590
Plaintiff *pro se*
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. ERIC T. SCHNEIDERMAN          LEILANI RODRIGUEZ, ESQ.
Attorney General for the State of New York   LISA FLEISCHMAN, ESQ.
Counsel for Defendant                 Assistant Attorneys General
120 Broadway                          One Civic Center Plaza
New York, New York 10271              Poughkeepsie, New York 12601


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

## I.      INTRODUCTION

        Petitioner Kareem Ramsey, a New York State prison inmate appearing *pro se*, has filed a

timely petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Petitioner challenges a

February 24, 2004, judgment of conviction in Onondaga County Court, convicting him of murder

_____

        [1]  This proceeding has been referred to me for Report and Recommendation by the
Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and
Northern District of New York L.R. 72.3(c).

in the second degree, N.Y. Penal Law § 125.25(1), and criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03(former 2).[2] (Dkt. No 8-5 at 180.) Petitioner was sentenced to serve a term of twenty-five years to life on his murder conviction and fifteen years on his weapon possession conviction, with the sentences to run consecutively. *Id*. at 197. Petitioner was also sentenced to five years of post-release supervision. *Id*.

On February 9, 2009, Petitioner's conviction was unanimously modified by the Appellate Division, Fourth Department, which directed that the sentence imposed on the weapon possession conviction run concurrently with the sentence imposed on the murder in the second degree conviction. (Dkt. No. 8-8 at 2-3.) The judgment was affirmed as modified. *Id*. at 2-5. Leave to appeal to the New York Court of Appeals was denied. *People v. Ramsey*, 872 N.Y.S.2d 789 (4th Dep't 2009), *lv. denied,* 881 N.Y.S.2d 670 (2009).

Petitioner has raised the following claims: (1) the trial court erred in refusing to charge the jury with the lesser-included offence of manslaughter in the first degree; (2) Petitioner was denied his constitutionally protected right to defend himself on the charges based on the trial court's ruling striking the testimony of a key witness; and (3) the trial court erred in sentencing Petitioner to a consecutive term on his conviction for criminal possession of a weapon.[3] (*See*

---

[2] I am mindful that the submissions of the *pro se* Petitioner "however, inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and interpret the Petition herein "to raise the strongest arguments [it] suggest[s]." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

[3] Because the Appellate Division, Fourth Department has already modified the sentence imposed on Petitioner by the trial court on his weapon possession conviction in the manner requested by Petitioner in this proceeding, Petitioner's third ground for relief is moot. (Dkt. Nos. 6, at ¶ 2; 7 at 25-25.) *See Ramsey*, 872 N.Y.S.2d at 791 ("We agree with defendant that the sentences must run concurrently . . ., and we therefore modify the judgment accordingly.")

Dkt. No. 1.)  For the reasons that follow, I recommend that the District Court deny the Petition.

## II.     THE TRIAL AND PETITIONER'S DIRECT APPEAL

### A.     Shana Goodson's History with Petitioner and Buckingham

The charges against Petitioner arose out of an altercation between Petitioner and Tyrone Buckingham ("Buckingham") on April 15, 2003, in the 100 block of Fernwood Avenue in Syracuse, New York, during which Buckingham was shot and killed by Petitioner.  (Dkt. No 8-2 at 190-93.)  At the time of the shooting, Petitioner was living at 139 Fernwood Avenue with Shana Goodson ("Goodson"), a woman whom he had started dating some three months earlier.  (Dkt. No. 8-4 at 91-93.)  Goodson was expecting Petitioner's child.  *Id*. at 120.  Prior to becoming involved with Petitioner, Goodson had been involved in a relationship with Buckingham, who had lived with her at the Fernwood Avenue address.  (Dkt. Nos. 8-2 at 22; 8-3 at 12-13.)

According to Goodson's younger sister, Kathleen Dings ("Dings"), who stayed with her sister some of the time, Goodson and Buckingham argued all the time, and Buckingham had physically abused Goodson.  (Dkt. No. 8-3 at 11-13.)  Dings testified that Buckingham had also threatened Goodson with a gun while they were living on West Onondaga Street in Syracuse.  *Id.* at 23-24.  After Goodson and Buckingham broke up, he continued to come around a lot – more than once a day – on a regular basis.  *Id.*  at 14-15.  Buckingham continued to frequent Goodson's apartment even after Petitioner had moved in with Goodson.  *Id.* at 17.  Dings testified that Buckingham had told Goodson he was going to do something to her because he did not want to see her with anyone else.  *Id.* at 18.

_____

(citations omitted).

3

### B. Petitioner's History with Buckingham

Petitioner testified that shortly after Valentines Day on 2003, he was with Goodson at her cousin's house. (Dkt. No. 8-4 at 107-08.) Petitioner saw Goodson and Buckingham arguing and heard Buckingham say "you are not going to be with this dude." *Id.* at 108. Petitioner got in the middle and asked Buckingham who he was and what he meant, and the two began arguing. *Id.* Buckingham hit Petitioner, knocking him unconscious. *Id.* When Petitioner regained consciousness, Buckingham was gone. *Id.* at 108-09. He learned Buckingham's identity from Goodson. *Id.* at 109.

According to Petitioner, he saw Buckingham again a short time later when he returned to the Fernwood Avenue residence he and Goodson shared and found Buckingham there. *Id.* at 110. Petitioner testified that Goodson was crying and looked upset. *Id.* Buckingham was standing on the upstairs porch and yelled to Goodson, "Who the fuck is that nigger?" That evening, Petitioner learned that Buckingham might have had a weapon. *Id.* at 112.

Petitioner next saw Buckingham about two or two and a half weeks before the shooting. *Id.* at 116. Petitioner and Goodson were going to a friend's house, and Buckingham drove by in a car with two other men. *Id.* at 114-15. Buckingham came back around and yelled something to Goodson. Petitioner turned and looked at Buckingham and said "Listen," you know, "I'm with her. Why are you doing this?" *Id.* at 115. Buckingham told Petitioner to "shut the F up or I'm gonna do something to you." Petitioner testified that Buckingham pulled out a pistol and pointed it out the window at Petitioner and yelled out to Goodson, "I'll pop that nigger now." *Id.* at 115-16. Petitioner got behind a tree. *Id.* at 116.

Petitioner and Goodson ran into Buckingham one more time before the shooting. They

were coming back from the store when Buckingham drove by and yelled to Goodson something to the effect of, "You're going to call me right?" *Id*. at 117. According to Petitioner, he kept walking because he didn't want any problems. *Id*. at 118.

### C. The Shooting

#### 1. Witnesses' Testimony

Dings saw Buckingham come by her sister's Fernwood Avenue apartment twice during the day of the shooting. (Dkt. No. 8-3 at 21.) Goodson was at work at the time, and Dings told Buckingham to leave because her sister did not want him there. *Id.* Angel Sellin ("Sellin"), who lived across the street from Goodson and was her friend, also testified that she had seen Buckingham in the neighborhood twice before the shooting. (Dkt. No. 8-2 at 236-37.) Petitioner did not see Buckingham. (Dkt. No. 8-4 at 121-22.)

Buckingham came by Goodson and Petitioner's apartment a third time at around nine o'clock in the evening. (Dkt. Nos. 8-2 at 238-39; 8-4 at 125.) According to witness Johnny Gainey ("Gainey"), who was across the street with his girlfriend Sellin, Buckingham drove by Goodson's Fernwood Avenue apartment. (Dkt. No. 8-3 at 64.) Petitioner was sitting with Goodson on the upstairs front porch of the Fernwood apartment at the time. (Dkt. No. 8-4 at 125-126.) Gainey testified that as Buckingham drove by, Petitioner called out "Yo" to him*,* and Buckingham stopped, backed up, and got out of his car in front of Goodson's apartment. (Dkt. No. 8-3 at 64.) Sellin, who was sitting on her front porch, testified that she saw Buckingham pull up on the side of the street, and Buckingham was still in his car talking on his cell phone when Petitioner got up and said what Sellin believed to be "Yo, Yo." (Dkt. No. 8-2 at 222.) Buckingham ended the call and backed up. *Id.* According to Sellin, Petitioner went into the

house and then went downstairs. *Id*. Buckingham was outside the car when Petitioner went over to him. *Id*. at 249.

Sellin went into the house and told her daughter Ashley Getman ("Getman") and Dings, who was playing with Getman, to stay in the house because she thought there might be trouble. *Id*. at 239-41. Sellin saw Petitioner and Buckingham arguing back and forth. Sellin testified that the only thing Buckingham had in his hands was his cell phone, and that up until Petitioner pointed his finger at Buckingham's head, Buckingham's hands were at his sides. *Id.* at 223, 249-51. Sellin testified that when Petitioner pointed his finger at Buckingham's head, Buckingham said "Naw, man, it ain't even like that." *Id*. at 223. After that, Sellin heard gunshots. Buckingham fell, and Petitioner ran. *Id*.

According to Gainey, the conversation between Petitioner and Buckingham began to get loud, and Gainey saw Petitioner pull a gun out from the back of his pants and put it to Buckingham's head. (Dkt. No. 8-3 at 65, 94.) Buckingham pushed the gun away with his hands and said, "Done with that." Petitioner then stepped back and fired four times. Buckingham fell with the final shot. *Id*. Gainey testified that the whole incident occurred in about three or four minutes. *Id*. at 75. As with Sellin, the only thing Gainey saw in Buckingham's hands was his cell phone. *Id*. at 97.

On autopsy, Buckingham was found to have sustained gunshot wounds that went through and through his chest, abdomen, and right elbow and caused injury to his heart, lungs, mesentary, and small bowel. (Dkt. No. 8-3 at 50.) Cause of death was identified as multiple gunshot wounds, and the death was ruled a homicide. *Id* at 51. Buckingham was found to have a .15 blood alcohol level at the time of death. *Id*. at 56. Petitioner had been drinking beer prior to the

shooting.  (Dkt. No. 8-4 at 125.)

### 2. Petitioner's Direct Testimony

Petitioner testified that when he yelled to Buckingham, Buckingham had already stopped his car, and Petitioner had come downstairs to tell Goodson's daughter to go upstairs.  (Dkt. No. 8-4 at 126-27.)  Petitioner saw Buckingham, who was on his cell phone, get back in his car and out again, which made Petitioner curious as to whether Buckingham had retrieved a weapon.  *Id.* at 127.  Petitioner himself had a gun stuck in the back of his pants and had put a shirt on before he went downstairs.  (Dkt. No. 8-4 at 152, 158.)  According to the Petitioner, a friend had paid him to hold the loaded gun for him for a while.  *Id*. at 122, 156.  Petitioner testified at trial that he had the gun on him at the time of the shooting because his friend had told him earlier in the evening that he needed the gun, and Petitioner was waiting for him to come and get it.  *Id*. at 128, 155-57.  Petitioner asked Buckingham if he could talk to him, walked over, and said, "You are causing problems around here, and you know what you've been doing, so can you please stop coming here?"  *Id*. at 128-29.  Buckingham replied "I'm going to come where the fuck I want to come.  Mother fuckers down here know me."  *Id*.  The two started arguing back and forth.  Buckingham pushed Petitioner, and after Petitioner pushed back, Buckingham said "I'm going to pop you, nigger."  *Id*.  Petitioner backed up when Buckingham made a gesture of lifting his shirt at his side because he thought it was possible Buckingham had a gun.  *Id*.  Petitioner then pulled out his gun to try to protect himself and shot Buckingham.  *Id*. at 129-30.  Petitioner testified that he didn't really know he was pulling the trigger because he was focused on protecting himself.  *Id*. at 130.  When Buckingham fell, Petitioner ran off.  *Id*.

3.     Petitioner's Statement

Petitioner gave a written statement to Detectives Christopher DeJoseph ("DeJoseph") and Clark Farry ("Farry") two days after the shooting. (Dkt. No. 8-4 at 13-15, 18-19, 22.) The six page statement, typed by DeJoseph and given to Petitioner for review, was signed on each page by Petitioner and the two detectives involved in questioning him.[4] (Dkt. Nos. 8-1 at 67-68; 8-4 at 19, 49.) The statement was read into evidence at trial. (Dkt. No. 8-4 at 22-29.)

In his statement, Petitioner said he loved Goodson very much, and that they had been having problems with Buckingham stalking her since they got together because Buckingham had never accepted he was no longer with Goodson. *Id*. at 22. According to Petitioner, he "tried to control [his] feelings of anger towards Tyrone, but he [had] pushed and pushed [him]." *Id*. at 23. Petitioner felt that Buckingham was disrespecting him. *Id*. On the day of the shooting, Goodson told Petitioner that Buckingham had driven by and asked if he "could holler at her."[5] *Id*.

When Buckingham drove by the evening of the shooting "it was too much for [Petitioner]

_____

[4] Detective Farry testified at trial that the Detectives offered to let Petitioner write out his own version of what had happened, and Petitioner declined. (Dkt. No 8-4 at 60.) Petitioner testified he never went over the statement with the Detectives and did not read the statement before signing it. at 142-43, 146, 174-76. According to DeJoseph, he and Petitioner read the typed statement along together before Petitioner signed it. (Dkt. No. 8-1 at 68.) DeJoseph put the hard copy down next to Petitioner and read the words to him as Petitioner followed along listening and looking at the statement. *Id*. Petitioner testified that the Detectives had told him that talking to them was the best thing he could do for Goodson and himself, and that if he talked to them, Goodson would be allowed to go home. (Dkt. No. 8-4 at 139-41.) According to Petitioner, the Detectives told him that once he signed the statement, they would bring Goodson in to show him that she was going home. *Id*. at 146. They did bring her in after Plaintiff signed the statement. *Id.*

[5] Plaintiff testified that "holler at you," means to spend time with you or speak with you. (Dkt. No. 8-4 at 177-78.)

handle right then at that moment." *Id*. at 24. "[He] had so much built up inside [him] about

Tyrone," Petitioner had "given all [his] love to Shana and her daughter and Tyrone was gonna'

interfere with that." *Id*. According to Petitioner's statement:

> Tyrone stopped and backed his car up and got out. I put my boots
> on and got my gun from the bedroom. I put four bullets in it. It
> was hidden and Shana didn't know it was there. I put the gun in
> my pants and put a shirt on and went downstairs . . . . I saw Tyrone
> had got back in his car. I was still standing on the downstairs front
> porch. I was thinking this is strange, and that he might have a gun
> in the car . . . . I felt like I had to let him know that this whole thing
> was serious. I wanted to let him know my relationship with Shana
> was serious and ask him what was it going to take to leave us
> alone. Then he got out of the car and I walked over to him politely.
> I was trying not to act aggressive, but when I got up to him, he was
> eating something and wasn't paying attention to me.[6]

*Id*. at 25.

According to Petitioner's statement, when he told Buckingham how serious the situation

was and asked what it would take to end Buckingham's harassment, Buckingham responded

something to the effect "I'm gonna' come where the fuck I wanna' come. Mother fuckers out

here know me." *Id*. At that point Petitioner "just snapped" and asked Buckingham, "What the

fuck you mean, you just gonna' keep come'n round here?" *Id*. Buckingham kept eating his

food, "and his whole body language was saying to me that he don't care." *Id*. at 26.

By that point, Petitioner felt that no matter what he said to Buckingham, nothing would

---

[6] When asked by his attorney on direct, Petitioner denied telling the Detectives that he
had grabbed the gun and put four bullets in it. (Dkt. No. 8-4 at 145.) According to Petitioner, he
already had the gun hidden on him. *Id*. Petitioner also denied telling the Detectives that
Buckingham was eating something. *Id*. at 183. According to Petitioner, Buckingham had just
finished eating something. *Id*.

get solved.  Petitioner then:

> pointed [his] finger in [Buckingham's] face and yelled "you gonna'
> leave us alone, man!"  He pushed my hand away and I backed up a
> bit and pulled the gun out of my pants.  I pointed the gun at the side
> of his head and yelled again for him to stop coming around here.
> Then he pushed the gun away and I stepped back a bit and just
> pulled the trigger without thinking.  It clicked but it didn't go off.
> This made me nervous, like he had the advantage and was gonna'
> go for his gun, so I shot again.  The gun went off, but I didn't know
> if he was hit.  He was still standing and I didn't see any blood.  I
> just started squeezing the gun and firing until the gun was empty.
> When Tyrone fell, I realized what I had done, and ran.[7]

*Id.* at 26.

Petitioner ended his statement about the shooting by saying "I didn't mean for this to happen, and God knows I didn't want to do that.  I just wanted Tyrone to listen to me like a man, but he wouldn't.  At that moment I felt like nothing else was gonna' solve the issue."  *Id.* at 29.

### 4.    Cross-examination of Petitioner

On cross-examination, Petitioner testified he did not see a gun in Buckingham's hands and did not see Buckingham pull a gun on him, although Buckingham did have something in his hands, and Petitioner thought it might be a gun.[8]  *Id.* at 205.  According to Plaintiff, he had reason to be concerned because he had seen Buckingham with a gun in the past.  *Id.* at 166-67.

---

[7]  At trial, Petitioner denied ever pointing a gun at the side of Buckingham's head, testifying that he had pointed his finger and Buckingham had pushed it away.  (Dkt. No. 8-4 at 145, 184.)  Petitioner also denied ever saying that the gun did not fire the first time he pulled the trigger.  *Id.* at 203.  According to Petitioner, the gun fired each of the four times he pulled the trigger.  *Id.*

[8]  Plaintiff conceded that he did not see that Buckingham had any kind of weapon at the time of the shooting.  (Dkt. No. 8-4 at 164.)

### D.      Excluded Testimony

It is clear from defense counsel's opening that Petitioner intended to rely upon the sometimes violent relationship between Goodson and Buckingham as support for the justification defense he pursued at trial.  (Dkt. No. 8-2 at 177-82.)  Counsel told the jury in his opening that Goodson would be testifying about the relationship and also about how Buckingham continued to pursue her after she became involved with Petitioner and threatened both Goodson and Petitioner.  *Id*. 183-84.

When cross-examining Dings, defense counsel was permitted to question her regarding her observations as to the relationship between Goodson and Buckingham, including that Buckingham at times hit Goodson and often threatened her, including threatening her with a gun at one point.  (Dkt. No. 8-3 at 12, 18-25.)  However, the trial court did not allow defense counsel to question Dings as to how her sister looked or acted in response to Buckingham's threats.  *Id*. at 18-20.

Defense counsel also attempted to elicit testimony from Petitioner regarding things Goodson had told him about the violent nature of her relationship with Buckingham and problems she had with Buckingham following their break-up.  (Dkt. No. 8-4 at 89, 94, 96-97.)  The trial court disallowed the testimony on hearsay grounds over defense counsel's objection that the testimony was admissible because it was being offered to establish Petitioner's state of mind at the time of the shooting in support of his justification defense.  *Id*. at 97-106.  The trial court noted that Petitioner was free to call Goodson as a witness.  *Id.* at 106.

Petitioner subsequently did call Goodson for the limited purpose of questioning her

concerning her relationship with Buckingham, problems she had with him following their break-up, and incidents involving Goodson, Buckingham, and Petitioner. (Dkt. No. 8-4 at 249-69.) Goodson testified that she had told Petitioner about the physical abuse she had gone through with Buckingham and the threats Buckingham had made about what he would do if he saw her with anyone else. *Id.* at 266.

The abuse to which Goodson testified included Buckingham attempting to hit her with a beer bottle and having the bottle break in his hand, cutting him instead. *Id.* at 250. Buckingham also pushed Goodson down the stairs because she didn't want him to leave the house, and threatened her with a gun a couple of times when she threatened to leave him. *Id.* at 251-52. Another time, Buckingham and Goodson had a physical altercation that resulted in Goodson attempting to seek safety at Sellin's house across the street, only to have Buckingham drag her by her hair back across the street. *Id.* at 254-56. According to Goodson, Buckingham told her that if he ever saw her with someone else he would hurt both of them. *Id.* at 253.

Goodson testified that after she told Buckingham to leave her house on New Year's Eve, he continued driving by and coming into her apartment at will because she did not have locks on the doors. *Id.* at 259-62. Buckingham kept coming to her apartment even after she became involved with Petitioner, including one time when Petitioner was there, even though, according to Goodson, she told Buckingham all the time to leave her alone. *Id.* at 267-269.

Although defense counsel intentionally limited the scope of his direct examination of Goodson to the problems in her relationship with Buckingham, on cross-examination, over defense counsel's objection that the questioning was beyond the scope of direct, the prosecutor was allowed to question Goodson concerning the shooting. (Dkt. No. 8-5 at 2.) During cross-

examination, Goodson testified that she had not only been untruthful in her statements to the police, but in her testimony before the grand jury. *Id*. at 11-12. At that point the trial court stopped Goodson's testimony, appointed counsel for Goodson to assist her in deciding whether she wanted to continue her testimony or invoke her Fifth Amendment privilege against self-incrimination, and informed Goodson and counsel that if Goodson did not continue testifying, the testimony she had already given would be stricken in its entirety. *Id*. at 18-19, 21.

Defense counsel renewed his objection to the prosecutor questioning Goodson beyond the scope of direct and argued against the striking of Goodson's direct testimony, since the issue of her being untruthful in her statements and grand jury testimony had come out only as a result of the prosecutor going beyond the scope of direct. *Id*. at 19-22. When Goodson decided not to continue her testimony, the trial court did strike her entire testimony. *Id*. at 24-27.

### E. Petitioner's Motion for a Mistrial

Defense counsel moved for a mistrial when the trial court ruled that it was striking Goodson's direct testimony supporting Petitioner's justification defense. *Id*. at 28. While the trial court acknowledged that it had been wrong in overruling defense counsel's objection that cross-examination was going beyond the scope of direct, the court concluded that the court's mistake and the striking of Goodson's testimony did not warrant a mistrial. *Id.* at 29-32.

### F. The Charge

The trial court granted Petitioner's request to include the defense of justification in the charge to the jury. (Dkt. Nos. 8-4 at 243; 8-5 at 104-16.) However, the trial court declined to charge manslaughter in the first degree, Penal Law § 125.20(1), (2) as a lesser-included offense of murder in the second degree as requested by Petitioner. (Dkt. No. 8-4 at 232-40.) Penal Law

§ 125.20(1) provides that "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person." *Id*. at 240-43. The trial court's articulated rationale for denying the request to charge § 125.20(1) was "[w]hen someone stands three feet away from another individual and shoots them four times, I think his – his intent is to kill that person." *Id*. at 241. The trial court also denied Petitioner's request to charge extreme emotional disturbance, Penal Law § 125.20(2), based upon the evidence which, in the court's opinion, did not "rise[] to the level of even considering extreme emotional disturbance."[9] *Id*. at 234.

### G.  Jury Deliberations and the Verdict

During deliberations, the jury asked the trial court for a re-reading of the justification charge and a reading of the testimony of witnesses Sellin, Gainey, Dings, Getman, and Farry; and for three exhibits: (1) Petitioner's signed statement; (2) photos of Buckingham; and (3) a big picture of the neighborhood. (Dkt. 8-5 at 158-59.) The trial court re-read the justification charge in its entirety, gave the jury the requested exhibits, and asked the jury to go back to the jury room and talk things over, try to refine the request for testimony, and send another note as to whether they wanted to hear all of the requested testimony, or only some part thereof. *Id*. at 161-62. The jury later limited its request for testimony to "[a]ll testimony [by Gainey, Dings, Sellin, and Getman] relating to [Buckingham] and [Petitioner's] hand gestures during their argument on April 15th." *Id*. at 174-75. The testimony was read, and the jury continued its deliberations at 2:03 in the afternoon. *Id.* at 176. The jury returned to the courtroom with its verdict at 3:47 the

---

[9]  The trial court explained that "[t]he fact that [Petitioner] may have been angry, embarrassed, jealous, it doesn't amount to what I think the statute calls for, which would be more in the realm of rage." (Dkt. No. 8-4 at 234.) The trial court also considered Petitioner's testimony that he went out to settle a dispute, was not angry when he went out, and did not go towards Buckingham in an aggressive manner. *Id*. at 238-39.

same afternoon.  *Id*. at 179.  The jury found Petitioner guilty of murder in the second degree and criminal possession of a weapon in the second degree.  *Id*. at 180.

### H.    Petitioner's Post-Trial Motions

At sentencing, Petitioner moved to set aside the verdict and for a new trial on a number of grounds.  (Dkt. No. 8-5 at 191.)  The first ground was the trial court's "failure to charge extreme emotional disturbance as a defense in this particular case as a lesser-included offense for assault or manslaughter in the first degree."  *Id*.  The second involved the trial court's rulings on the cross-examination of Goodson and the striking of Goodson's testimony in its entirety.  *Id*. at 191- 92.  The third was the trial court's limiting of defense counsel's direct examination of Petitioner relative to his justification defense, which defense counsel argued had "limited and handcuffed [Petitioner's] defense to put before this jury that he was justified in his actions."  *Id.* at 192.  The trial court denied Petitioner's post-trial motion.  *Id*. at 193.

### I.    Petitioner's Direct Appeal

Represented by new counsel, Petitioner appealed his conviction to the Appellate Division, Fourth Department.  (Dkt. No. 8-6 at 2.)  Petitioner sought reversal of his conviction on the grounds that the trial court had: (1) erred in refusing to charge the lesser included offense of manslaughter in the first degree based upon lack of intent to kill but only to cause serious physical injury, and acting under the influence of extreme emotional disturbance, *id*. at 7-17; (2) denied Petitioner's right to defend himself on the charges based on the trial court's rulings striking Goodson's testimony, limiting the defense's cross-examination of Dings, and precluding Petitioner's testimony on what Goodson had told him concerning her problems with Buckingham, *id*. at 18-27; and (3) erred in sentencing Petitioner to consecutive terms on his

convictions for murder in the second degree and criminal possession of a weapon in the second degree. *Id.* at 28-29.

In its Memorandum Opinion, *Ramsey*, 872 N.Y.S.2d 789, the Appellate Division concluded that the trial court had properly denied Petitioner's request to charge manslaughter in the first degree under Penal Law §125.20(1) and (2). *Id.* at 790. The appellate court determined that there was no reasonable view of the evidence under which Petitioner, who shot Buckingham four times at close range causing him to sustain fatal injuries to his heart and lungs, could be found to have intended to cause serious physical injury, but not to kill Buckingham. *Id.* The appellate court further determined that Petitioner had failed to establish that he acted under the influence of an extreme emotional disturbance given Petitioner's testimony that he shot Buckingham both because he was angry and because he feared for his own safety, and that he was calm immediately prior to the shooting. *Id.*

The Appellate Division concluded that Petitioner had failed to preserve for appellate review his claim that he was denied the right to present a defense based upon the trial court's evidentiary rulings. *Id.* at 790-91. The appellate court found in the alternative that Petitioner's argument lacked merit. *Id.* The court agreed with Petitioner that the trial court had erred in precluding him from testifying concerning threats made by Buckingham to Goodson and in allowing the prosecutor to cross–examine Goodson beyond the scope of direct. *Id.* at 791. However, the errors were found to be harmless because the precluded testimony was essentially cumulative of other testimony. *Id.*

Although Petitioner failed to preserve his contention that the trial court erred in imposing a consecutive sentence on weapon possession conviction for appellate review, because the

prosecution conceded that the consecutive sentence was illegal, preservation was found

unnecessary, and the appellate court found that the sentences had to run concurrently. *Id*.

The New York Court of Appeals denied Petitioner leave to appeal his conviction.

*Ramsey*, 881 N.Y.S.2d 670.

## III. ANALYSIS

### A. Standard for Habeas Corpus Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an

application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated
> on the merits in State court proceedings unless the adjudication of
> the claim – (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States; or (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding.

28 U.S.C. § 2254(d).

"For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's

federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its

disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). Where

AEDPA's deferential standard of review applies, "[a] state court's determination of a factual

issue is presumed to be correct, and may only be rebutted by clear and convincing evidence."

*Bierenbaum v. Graham*, 607 F.3d 36, 48 (2d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)). Claims

not adjudicated on the merits in state court are not subject to the AEDPA deferential standard of

review. *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

In determining whether a state court has adjudicated a claim "on the merits," a federal habeas corpus court must classify the state court decision as either (1) fairly appearing to rest primarily on federal law or to be interwoven with federal law; or (2) fairly appearing to rest primarily on state procedural law.[10] *Jimenez v. Walker*, 458 F.3d 130. 145 (2d Cir. 2006). Decisions in the first category are deemed to have been made "on the merits" of the federal claim. *Id.*

A decision "on the merits" is contrary to clearly established federal law when it is either contrary to Supreme Court precedent on a question of law or opposite to a relevant Supreme Court case with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court unreasonably applies federal law when the state court correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). A state court's unreasonable application of law must have been more than "incorrect or erroneous"; it must have been "objectively unreasonable." *Sellan*, 261 F.3d at 315 (citations and internal quotation marks omitted). Although "[s]ome increment of incorrectness beyond error is required" in order to

_____

[10] Federal habeas corpus review is limited to determining whether petitioner's custody violates federal law. *See* 28 U.S.C. § 2254(a). Federal habeas relief does not "lie for errors of state law." *Swarthout v. Cooke*, ___ U.S. ___, 131 S. Ct. 859, 861 (2011). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 786 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas corpus relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") (citations and internal quotation marks omitted); *see also Jean v. Greene*, No. 12-203, 2013 WL 1501483, at *3, 2013 U.S. App. LEXIS 7765, at *9 (2d. Cir. April 15, 2013) ("Under AEDPA, the deference we ascribe to the determination of the state court is 'high[ ],' and we must give the state court's decision 'the benefit of the doubt.'") (quoting *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011)).

grant a federal habeas application, that increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (citation and internal quotation marks omitted); *see also Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006).

### B.    Denial of Petitioner's Request for a Lesser-Included Offense Charge

Petitioner contends that the trial court erred by refusing to charge the lesser-included offenses of manslaughter in the first degree, § 125.20(1) and (2) as a lesser-included offense of murder in the second degree under the theories that he only acted with the intent to cause serious injury, not death (Penal Law § 125.20(1)), or in the alternative, that he acted under the influence of extreme emotional disturbance (Penal Law §§ 125.20(2)).  (Dkt. No. 1-1 at 6-15.)  The Appellate Division ruled on appeal that the trial court had properly denied Plaintiff's request for those lesser included defense charges.  *Ramsey*, 872 N.Y.S.2d at 790.

Habeas review is limited to "deciding whether a conviction violated the Constitution, laws or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  In *Beck v. Alabama*, 447 U.S. 625, 638 & n.14 (1980), the Supreme Court held that in capital cases, a defendant has a right to an instruction on a lesser-included offense under the Due Process Clause of the Fourteenth Amendment.  However, in *Beck*, the Supreme Court expressly reserved the question of whether the Due Process Clause requires that the jury be given a lesser-included offense charge in non-capital cases, *id*. at 638 n.14, and has not yet resolved the issue.  The Second Circuit has also refrained from deciding the issue, reasoning that "since a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule, we hold that *Teague* [*v.*

*Lane,* 489 U.S. 288 (1989),] precludes our consideration of the issue."[11]  *Jones v. Hoffman,* 86

F.3d 46, 48 (2d Cir. 1996).

Because there is no Supreme Court precedent requiring that lesser-included offenses be

charged in non-capital cases, the Appellate Division's rejection of Petitioner's claim cannot have

been "contrary to, or involved an unreasonable interpretation of, clearly established Federal law,

as determined by the Supreme Court." 28 U.S.C. § 2254(d); *see Sostre v. Lee,* No. 11-CV-3439

(KAM), 2013 WL 3756474, at *6-7, 2013 U.S. Dist. LEXIS 98499, at *15-17 (E.D.N.Y. Jul. 15,

2013); *Heslop v. Artus,* No. 9:08-CV-1105 (LEK/RFT), 2012 WL 6553399, at *7-8, 2012 U.S.

Dist. LEXIS 178189, at *20-21 (N.D.N.Y. Mar. 22, 2012) (a claim based on the alleged error of

the trial court to charge a lesser-included offense is not cognizable on habeas review); *Marquez v.

Artus,* No. 08 Civ. 10847 (PKC)(HBP), 2012 WL 691449, at *1, 2012 U.S. Dist. LEXIS 28132,

at *2-3 (S.D.N.Y. Mar. 2, 2012) (concluding that lesser-included offense claim was a state law

claim not cognizable on a federal writ of habeas corpus); *Alston v. Conway,* No. 9:03-CV-1528

(FJS/VEB), 2009 WL 818944, at *1, 2009 U.S. Dist. LEXIS 25396, at *1-2 (N.D.N.Y. Mar. 26,

2009) ("[F]ederal courts are precluded, in a habeas proceeding, from reviewing decisions

regarding the submission of lesser-included offenses in non-capital cases.").  As a result,

Petitioner's claim with regard to the lesser-included offense charge is not cognizable on a federal

---

[11]  In *Teague,* the Supreme Court established the antiretroactivity rule that habeas corpus "cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review."  489 U.S. at 316 (emphasis in original). The antiretroactivity rule announced in *Teague* was later codified by the AEDPA in 42 U.S.C. § 2254(d)(1).  *See Williams v. Taylor,* 529 U.S. 362, 379 (2000).

writ of habeas corpus.[12]

### C. Denial of Petitioner's Right to Present a Complete Defense

A criminal defendant has a constitutional right under the Sixth Amendment's Compulsory Process and Confrontation Clauses and the Fourteenth Amendment's Due Process Clause to "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "Indeed, '[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.'" *Hawkins*, 460 F.3d at 243 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

#### 1. The Trial Court

Petitioner contends that the ruling by the trial court striking Goodson's direct testimony when she chose to invoke her Fifth Amendment privilege against self incrimination on cross-

---

[12] Respondent has also argued that Petitioner failed to alert the state courts as to the constitutional nature of his lesser-included offense claim and, therefore, has failed to exhaust as is normally required before a party is entitled to federal habeas relief. (Dkt. No. 7 at 18.) *See* 28 U.S.C. § 2254(b)-(c); *Cotto v. Hebert*, 331 F.3d 217, 237 (2d Cir. 2003). A claim has been exhausted if it has been fairly presented in the state courts, thereby giving the state the "opportunity to pass upon and correct" alleged violations of federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citation and internal quotation marks omitted). "A petitioner satisfies the fair presentation aspect of the exhaustion requirement by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Cotto*, 331 F.3d at 237. Respondent is correct that Petitioner did not specifically assert violation of a constitutional right, nor did he employ a constitutional analysis relying upon pertinent federal case law in support of his lesser-included offense claim on his appeal to the Appellate Division. (Dkt. Nos. 8-4 at 232-243; 8-6 at 13-23.) However, a petitioner may also present his federal constitutional claims to the state courts through: (1) "reliance on state cases employing constitutional analysis in like fact situations"; (2) "assertion of the claim in terms so particular as to call in mind a specific right protected by the Constitution"; and (3) "allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982). Because I have concluded that Petitioner's lesser-included offense claim is not cognizable on a federal writ of habeas corpus, I find it unnecessary to analyze whether Petitioner fairly presented his constitutional claim in state court for exhaustion purposes.

examination denied him his constitutional right to present a complete defense at his criminal

trial.[13]  (Dkt. No. 1-1 at 16-28.)  Defense counsel made a contemporaneous objection to the

ruling striking Goodson's direct testimony on the grounds that Petitioner had not elicited the

testimony upon which Goodson was being impeached – testimony that was given in response to

questions by the prosecutor concerning the shooting that went beyond the scope of direct.[14]  (Dkt.

No. 8-5 at 21.)  Defense counsel explained to the trial court that the sole purpose of Goodson's

testimony had been to

> . . . establish a background and a relationship between her and the
> victim and her knowledge of the victim's relationship with the
> defendant.  It was strictly background and relationship to support
> the justification defense that I've asked this Court to charge, and
> this Court has recognized, and, also to overcome any burden the
> People may have to rebut that – that justification defense.

(Dkt. No. 8-5 at 19-20.)

In response to the trial court's assessment that "on balance, and in fairness to both sides,

[Goodson's] entire testimony should be struck," defense counsel stated:

> I would point out – what if she testified, which she has, about
> events that occurred at another date, place and time which has no
> bearing on the incident involved in this case, you're telling me that
> because her testimony – she can't testify about Day Twelve, yet her
> testimony about Day One and Two should be stricken as well,
> when it has absolutely no bearing on Day Twelve.

---

[13]  The *pro se* Petition can also be liberally construed to challenge the trial court's rulings
precluding Petitioner from testifying regarding things Goodson had told him about her
relationship with Buckingham, and Dings from testifying as to how Goodson looked and acted in
response to Buckingham's threats.  (Dkt. Nos. 8-3 at 18-2; 8-4 at 97-106.)

[14]  Petitioner disputed the trial court's reasoning that even if the prosecutor had adopted
Goodson as his own witness by questioning her outside of the scope of direct, he would have
been able to impeach her using a prior statement or testimony under CPL § 60.35.  (Dkt. No. 8-5
at 22-23.)

*Id*. at 24.

Petitioner also moved for a mistrial based in part on the trial court's ruling striking

Goodson's direct testimony, arguing that ". . . since the Court has made its ruling, I would, again,

based on what I believe to be some significant legal mistakes made in this case, including the last

ruling by the Court that will strike Miss Goodson's testimony on her direct, dealing with the

relationships supporting the defense of justification, I would ask for a mistrial because I think it's

a clear reversible error, Your Honor." (Dkt. No. 8-5 at 28.)

While conceding that it had likely erred in allowing the People to impeach Goodson, who

had become the prosecution's own witness when cross-examination went beyond the scope of

direct, the trial court nonetheless found no grounds for granting a mistrial. *Id*. at 30, 32.

2.      The Appellate Division

On appeal to the Appellate Division, Petitioner raised denial of his constitutional right to

present a complete defense as a result of the striking of Goodson's testimony, along with the trial

court's evidentiary rulings which resulted in the exclusion of Petitioner and Ding's testimony on

matters relating to Goodson's relationship with Buckingham. (Dkt. No. 8-6 at 24-33.) In its

Memorandum and Order, the Appellate Division wrote:

> Defendant failed to preserve for our review his contention that
> he was denied his right to present a defense based on the court's
> evidentiary rulings (*see People v Angelo*, 88 NY2d 217, 22). In
> any event, that contention lacks merit. We agree with defendant
> that the court erred in precluding him from testifying concerning
> threats made by the victim to defendant's girlfriend (*see People v
> Miller*, 39 NY2d 543, 548-549; *People v Henderson*, 162 AD2d
> 1038; *People v Dixon*, 138 AD2d 929), and that the court further
> erred in permitting the prosecutor to cross-examine defendant's
> girlfriend beyond the scope of her limited direct examination (*see*

> generally *People v Maerling*, 64 NY2d 134, 141-142); *People v Sanders*, 2 AD3d 1420). Nevertheless we conclude that any error is harmless (*see generally People v Crimmins*, 36 NY2d 230, 241-242). Indeed we note that the precluded testimony was essentially cumulative of other evidence presented at trial (*see People v Diallo*, 297 AD2d 247, 248; *People v Starostin*, 265 AD2d 267, *denied* 88 NY2d 981; *see generally People v Dolan*, 51 AD3d 1337, 1341), and that defendant was provided "'a meaningful opportunity to present a complete defense.'" (*Crane v Kentucky*, 476 U.S. 683, 690; *see People v Douglas*, 29 AD3d 47, 50, *lv denied* 6 NY3d 847).

(Dkt. No. 8-8 at 3); *Ramsey*, 872 N.Y.S.2d at 790-91.

### 3.    Independent and Adequate State Law Grounds

Respondent contends that the Appellate Division's ruling that Petitioner had failed to preserve his complete defense claim operates as a procedural bar to federal habeas review. (Dkt. No. 7 at 22-23.) Under principles of comity and federalism, federal courts normally "will not review a question of federal law decided by a state court if the decision rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Garcia v. Lewis*, 188 F.3d 71, 76 (2d Cir. 1999) (citation and internal quotation marks omitted). "The adequate and independent state ground doctrine applies on federal habeas." *Harris v. Read*, 489 U.S. 255, 262 (1989). The doctrine "'ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.'" *Garcia*, 188 F.3d at 76 (quoting *Coleman* v. *Thompson*, 501 U.S. 722, 732 (1991)). The "rule applies whether the state law ground is substantive or procedural." *Coleman*, 501 U.S. at 729.

"Adequacy" is generally assessed by "examining whether the rule upon which the state court relied is 'firmly established and regularly followed.'" *Downs v. Lape*, 657 F.3d 97, 102 (2d Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S.Ct, 2439 (2012) (quoting *Walker v. Martin*, ___

U.S. ___, 131 S.Ct. 1120, 1127 (2011)). Adequacy of a procedural bar is a federal question. *Lee v. Kemna*, 534 U.S. 362, 375 (2002). A state court judgment is independent if it rests on grounds independent of the merits of a federal claim. *Harris,* 489 U.S. at 260.

It is well-settled that a state procedural default qualifies as an adequate and independent state law ground unless the petitioner can show either: (1) "cause for the default and actual prejudice" attributed thereto; or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Martinez v. Ryan* ___ U.S. ___, 132 S. Ct. 1309, 1316 (2012) ("The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law.").[15] "'Cause' requires a showing that 'some objective factor external to the defense impeded counsel's efforts to raise the claim in state court' or that the basis for a claim was not reasonably available to counsel." *Brown v. Bradt*, No. 11-CV-972 (GLS/CFH), 2013 WL 1636070, at *11, 2013 U.S. Dist. LEXIS 55058, at *33-34 (N.D.N.Y. Mar. 25, 2013) (quoting *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 127 (2d Cir. 1995)). To show prejudice, a petitioner must demonstrate that the error by the state court worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted). A fundamental miscarriage of justice involves

---

[15] In *Trevino v. Thaler*, ___ U.S. ___, 133 S. Ct. 1911, 1917 (2013), the Supreme Court noted its recognition in *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1315-16 (2012) of both the "historic importance of federal habeas corpus proceedings as a method for preventing individuals from being held in custody in violation of federal law," and the "importance of federal habeas corpus principles designed to prevent federal courts from interfering with a State's application of its own firmly established, consistently followed, constitutionally proper procedural rules."

showing that the petitioner is actually innocent of the crime. *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003).

A procedural default bars habeas review only when the last state court rendering a judgment in the case "'clearly and expressly' states that its judgment rests on a state procedural bar." *Reid v. Senkowski*, 961 F.2d 374, 377 (2d Cir. 1992) (quoting *Harris,* 489 U.S. at 263). "Federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)); *see also Harris,* 489 U.S. at 264 n.10 (as long as a state court is explicit in its reliance on a procedural default, ". . . it need not fear reaching the merits of a federal claim in an *alternative* holding.") (emphasis in original). In this case, the Appellate Division expressly relied on Petitioner's failure to comply with New York procedural law as an independent state law basis for rejecting Petitioner's claim, and found, in the alternative, that Petitioner's claim also failed on the merits. *Ramsey*, 872 N.Y.S.2d at 790-91.

### 4. New York's Contemporaneous Objection Rule

The Appellate Division found that Petitioner had failed to preserve for appellate review his contention that he was denied his right to present a defense as a result of the trial court's evidentiary rulings. *Ramsey*, 872 N.Y.S.2d at 790. It is evident from the Appellate Division's explicit reliance on *People v. Angelo*, 644 N.Y.S.2d 460, 462 (1996) (holding due process claims unpreserved for appellate review where they were not presented to trial court along with evidentiary objections), that the appellate court found Petitioner's claim to be unpreserved based

on New York's contemporaneous objection rule, which requires "that a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling 'at the time such ruling . . . or any subsequent time when the [trial] court had an opportunity of effectively changing the same.'" *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting N.Y. Criminal Procedure Law ("CPL") § 470.05(2)).[16]

The Second Circuit has "held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural law." *Downs*, 657 F.3d at 104. Therefore, its application ordinarily constitutes an adequate state law ground for barring federal habeas review. *Lee*, 534 U.S. at 376; *see also Kozlowski v. Hulihan*, 511 F. App'x 21, 25 (2d Cir. 2013).

## 5. Application of the *Cotto* Factors

Having determined that the contemporaneous objection rule constituted an independent ground for disposing of Petitioner's claim, and that the rule is firmly established and regularly followed, I must still consider whether this is an "exceptional case[ ] in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Id.*; *see also Downs*, 657 F.3d at 104. Evaluation of whether a case presents an exception is accomplished by reference to the following three non-exclusive factors, or guideposts, which are: "(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded

---

[16] On Petitioner's appeal to the Appellate Division, the People cited CPL § 470.05(2) as the basis for the argument that Petitioner's claim that he had been deprived of the opportunity to present a complete defense as unpreserved. (Dkt. No. 8-7 at 26.)

in the specific circumstances presented; and (3) whether petitioner had substantially complied with the rule given the realities of trial, and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest." *Cotto*, 331 F.3d at 240.

With regard to the first *Cotto* factor, the question of whether the trial court "actually relied" on the procedural default "is less applicable in this case because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court." *Cotto,* 331 F.3d at 242. The other aspect of the first factor, whether perfect compliance would have changed the outcome, "is less relevant" in evaluating the failure to preserve a claim "because 'the likely impact of a contemporaneous objection involves a certain degree of speculation.'" *Ashley v. Burge*, No. 05 Civ. 4497(JGK), 2006 WL 3327589, at *5, 2006 U.S. Dist. LEXIS 83159, at *16-17 (S.D.N.Y. Nov. 3, 2006) (quoting *Cotto*, 331 F.3d at 242-43).

The second factor weighs heavily against Petitioner because New York courts have consistently demanded strict compliance with the contemporaneous objection rule in similar circumstances. *See, e.g.*, *Angelo*, 644 N.Y.S.2d at 462 (due process claims unpreserved for appellate review where they were not presented to trial court along with evidentiary objections); *People v. Kello*, 723 N.Y.S.2d 111, 113 (2001) (Confrontation Clause claim unpreserved where defendant based his trial objection on the state common-law hearsay rule because "failure to raise a Confrontation Clause objection precluded the trial court and prosecution from considering and, thus avoiding any constitutional error which . . . differs from the trial evidence error which was preserved); *People v. Fronjian*, 802 N.Y.S.2d 33, 34 (1st Dept. 2005), *lv. denied*, 811 N.Y.S.2d 343 (2006) ("Inasmuch as defendant did not assert a constitutional right to introduce the excluded evidence, his constitutional argument is unpreserved); *Wright v. Duncan*, 500 F. App'x

36, 38 (2d Cir. 2012) ("[T]he New York Court of Appeals has long rejected invitations to review constitutional arguments purportedly raised implicitly in the trial court.").

As for the third factor, Petitioner cannot be found to have substantially complied with the contemporaneous objection rule, even given "the realities of trial." *Whitley*, 642 F.3d at 287; *see Ashley,* 2006 WL 3327589, at *7 (petitioner failed to substantially comply with New York's preservation policy in a manner that served the rule's purpose where he never gave the court the opportunity to rule on whether the use of an alibi notice violated his constitutional rights); *Gadsden v. Lee*, No. 12-CV-4204 (JG), 2013 WL 3938500, at *5, 2013 U.S. Dist. LEXIS 106225, at *15 (E.D.N.Y. Jul. 30, 2013) ("[A] defendant must contemporaneously and specifically raise his constitutional arguments before the trial court."); *Royster v. Ercole*, No. 06 Civ. 12942 (SAS)(JCF), 2008 WL 542505, at *6, 2008 U.S. Dist. LEXIS 15424, at *17 (S.D.N.Y. Feb. 29, 2008) ("Under CPL § 470.05(2), the petitioner was required to make a specific constitutional objection to the introduction [of the hearsay testimony at issue] at trial to preserve his claim for appellate review.") (citations omitted).

Petitioner claims that he was denied his constitutional right to present a complete defense as a result of the trial court's rulings: (1) striking Goodson's direct testimony; (2) refusing to allow Dings to testify as to how her sister, Goodson, looked and acted in response to Buckingham's threats; and (3) refusing to allow Petitioner to testify regarding what Goodson had told him about the violent nature of her relationship with Buckingham and problems she had with him. Petitioner objected to the trial court's ruling striking Goodson's direct testimony because the questioning that led to Goodson's admission that she had not testified honestly before the grand jury came up only because the prosecutor was improperly allowed to go beyond the scope

of direct examination in his cross-examination.  (Dkt. No. 8-4 at 21-22.)  Petitioner also argued

that Goodson's direct testimony should not be stricken because it had no bearing on the incident

involved in the case.  *Id*. at 24.  Petitioner disputed the trial court's assertion that the testimony

would have come in under CPL § 60.35, allowing impeachment of a party's own witness on a

material issue of the case, even if the prosecutor had been forced to adopt Goodson as the

People's witness by going beyond the scope of direct on cross.  *Id.* at 22-23.  Petitioner did not

claim that striking Goodson's direct testimony constituted a denial of his constitutional right to

present a complete defense.  He relied solely on state evidentiary law.

The trial court limited the scope of Petitioner's examination of Dings regarding her

sister's looks and actions in response to Buckingham's threats on relevance grounds.  (Dkt. No.

8-3 at 18-19).  Defense counsel objected to the limitation solely by attempting to explain its

relevance.  *Id*. at 19.  Petitioner did not suggest that the trial court's evidentiary ruling denied him

his constitutional right to present a complete defense.  When the trial court ruled that Petitioner's

testimony regarding things Goodson had told him about the violent nature of her relationship

with Buckingham was inadmissible hearsay, defense counsel argued that the testimony was not

hearsay because the testimony went to the issue of Petitioner's mental state.  Counsel referred to

the limitation on Petitioner's testimony as "improper."  (Dkt. No. 8-4 at 98-100.)  Again,

Petitioner did not argue that excluding the testimony denied him his constitutional right to

present a complete defense.

The state interest underlying the contemporaneous objection rule is "to ensure that the

parties draw the trial court's attention to any potential error while there is still an opportunity to

address it."  *Cotto*, 331 F.3d at 245.  Petitioner's objections, based solely upon state evidentiary

law, deprived the trial court of that opportunity and failed to substantially comply with the contemporaneous evidence rule. In sum, I find that none of the three *Cotto* factors favors Petitioner, and that this is not an "exceptional case[ ]" involving the "exorbitant application of a generally sound rule." *Lee*, 534 U.S. at 376.

6. No Cause and Prejudice or Miscarriage of Justice

As noted above, a petitioner may obtain review of a procedurally defaulted claim by showing either "cause for the default and prejudice," or "a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Petitioner has done neither. He has not established the existence of any impediment to raising the constitutional claim as is necessary to show cause. *See Levine,* 44 F.3d at 127. "The mere fact that trial counsel 'failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.'" *Cintron v. Fisher*, No. 07-CV-1058 (KMK)(PED), 2012 WL 213766, at *1, 2012 U.S. Dist. LEXIS 8237, at *4 (S.D.N.Y. Jan. 24, 2012). Without cause for the default, prejudice is immaterial. *See Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985). Because the trial record does not support Petitioner's actual innocence in the killing of Buckingham, he cannot establish a fundamental miscarriage of justice. *See Sweet,* 353 F.3d at 141.

Based upon the foregoing, I find that federal review of Petitioner's claim that the trial court denied him his constitutional right to present a complete defense is procedurally barred under the independent and adequate state law grounds doctrine.[17]

---

[17] Petitioner's claim that he was denied his constitutional right to present a complete defense as a result of erroneous evidentiary rulings by the trial court is without merit in any event. "'[E]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather the writ would issue only where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial.'"

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Petitioner's Petition for a Writ of Habeas Corpus (Dkt. No. 1) be **DENIED**, and it is further

**RECOMMENDED** that no certificate of appealability should be issued with respect to any of Petitioner's claims as he has not made "a substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2).  See 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000); and it is hereby

---

*Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (quoting *Taylor v. Curry*, 708 F.2d 886, (2d Cir. 1983) (emphasis in original; citations omitted).  "[T]he materiality of the excluded evidence to the presentation of the defense . . . determines whether a defendant has been deprived of a fundamentally fair trial."  *Rosario*, 839 F.2d at 925.  The test for materiality is whether "the omitted evidence creates a reasonable doubt that did not otherwise exist," and if it does "constitutional error has been committed." *United States v. Agurs*, 427 U.S. 97, 112-13 (1976). The Appellate Division found that the trial court had erred in refusing to allow Petitioner to testify concerning threats made by Buckingham to his girlfriend and allowing the prosecution to go beyond the scope of direct in cross-examining Goodson. *Ramsey*, 872 N.Y.S.2d at 791. Moreover, the trial court may have erred in striking Goodson's entire testimony, rather than just the testimony related to the shooting, when she invoked her Fifth Amendment privilege against self-incrimination.  *See People v. Siegel*, 640 N.Y.S.2d 831, 835 (1995) (striking a witness' entire testimony is "the most drastic relief" available when a witness refuses cross-examination and less severe alternatives "are particularly worthy of consideration when a defense witness has invoked the privilege, in view of the defendant's Sixth Amendment right to present testimony.") However, the evidence excluded as a result of errors in evidentiary rulings arguably made by the trial court did not deprive Petitioner of a fundamentally fair trial.  A review of the record shows that there was substantial evidence before the jury of Buckingham's violence in his relationship with Goodson, threats he made to her, and his conduct towards her following their breakup. There was also substantial evidence of Petitioner's knowledge of Buckingham's violent propensities and history of carrying a gun.  The excluded testimony would therefore have been cumulative, and its absence cannot be said to have created a reasonable doubt that did not otherwise exist with regard to the issue of justification.

**ORDERED** that the Clerk's Office provide Plaintiff with copies of all unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: September 3, 2013
      Syracuse, New York

                                          Thérèse Wiley Dancks
                                      United States Magistrate Judge